UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AMERICAN SEATING COMPANY,

     Plaintiff,

                                 Case No. 1:05-CV-130

-vs-                            Hon:  AVERN COHN

FREEDMAN SEATING COMPANY,

     Defendant.

_____/


## *MARKMAN*[1] DECISION

## I.  INTRODUCTION

     This is a patent case.  Plaintiff, American Seating Company (ASC) is the owner by assignment of United States Patent No. 5,152,582 (the '582 patent), issued October 6, 1992, Self-Aligning Fastener System Having Stud-Engaging Resilient Legs.  ASC is suing defendant, Freedman Seating Company (Freedman) for infringement.  Particularly, ASC asserts that the '582 patent is directed to a seat insert fastening system and that Freedman is selling seats including a model known as the Angel Seat which utilizes the '582 patent's seat insert fastening system.

     Now ripe for decision after extensive briefing and oral argument is the proper construction of the ambiguous words and phrases of Claim 6, the designated paradigm claim of the '582 patent.

     Attached as Exhibit A is a chart displaying in columnar form the language of Claim

---

[1] Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

6, in which the ambiguous words and phrases are underlined, ASC's proposed construction, Freedman's proposed construction and the Court's construction. The Court's construction governs further proceedings in the case. This is a tentative decision; future proceedings may reveal aspects of the '582 patent which are not fully appreciated. This is particularly so since while the Court has been made aware of the characteristics of a fastener's use in the Angel Seat assembly, this construction exercise excludes consideration of these characteristics.

## II.  THE '582 PATENT:  CLAIM 6

### A.

The Abstract reads:

> A self-aligning fastener system incorporates a stud member fastened to a first member and a female member attached to a second panel member for fastening the first member to the panel member.  The female member includes a head portion which spans an aperture of the panel and has an aperture therethrough, the head portion includes leg portions which depend from the head portion which extend through the panel aperture and are engaged by a clip on the opposite side of the panel for retaining the female fastener in the aperture.  The panel aperture and leg spacing are dimensioned such that the female fastener is adapted to move along a first axis of said aperture thereby allowing the female fastener to accommodate any alignment errors between itself and the stud fastener along the first axis.  The leg portions of the female fastener have a pair of linear engagement surfaces arranged perpendicular to the first axis whereby the leg portions can engage and retain the stud member anywhere along their length.  This feature allows the fastener to accommodate alignment errors along a second axis perpendicular to the first axis.  The fastening system is also disclosed for use in a seat shell and seat insert assembly. [Emphasis added].

B.

Claim 6 (parsed alphanumerically) with the ambiguous phrases underlined reads:

1. 6. A seat insert fastening system, for fastening an insert to a seating portion of a seat shell, said system comprising:

2. a) a seat shell for supporting a user, said shell having an <u>engaging surface</u> and an inner portion defined by an inner surface, said surfaces connected by way of an aperture extending therebetween,

3. b) a seat insert adapted to generally conform to a contour of said engaging surface of said seat shell,

4. c) a stud fastener attached to said seat insert and having an elongated body portion extending from a surface of said seat insert,

5. d) <u>a female fastener</u>

6. i) having a <u>head portion</u>

7. ii) adapted to <u>span said seat shell aperture</u>, thereby preventing said fastener from passing through said seat shell aperture and into said inner portion of said seat shell,

8. iii) said head portion <u>having an aperture</u> therethrough and

9. iv) two spaced apart, resilient leg portions <u>extending therefrom</u> in a common direction and encircling a longitudinal axis of said aperture of said head portion,

10. v) said resilient legs <u>adapted to engage</u> said stud body and resiliently retain said body,

11. vi) said head portion of said female fastener adapted to engage said seat shell in the vicinity of said seat shell aperture such that said head portion <u>engages said engaging surface</u> of said seat shell and spans said seat shell aperture,

3

12.              vii)     wherein said leg portions extend through said seat shell aperture and into said inner portion of said seat shell, said leg portions spaced apart relative to said seat shell aperture such that said female fastener is permitted to move within said seat shell aperture along <u>a first axis parallel to said engaging surface of said seat shell,</u>

13.        e)     <u>a retaining member</u> adapted to reside in said inner portion of said seat shell

              i)     and <u>engage</u> said legs of said female fastener thereby preventing said female fastener from being pulled out of said seat shell aperture,

14.              ii)     <u>said retaining member allowing said female fastener to move along said first axis,</u>

15.        f)     whereby when said seat insert is placed adjacent said seat shell and said elongated body portion of said stud fastener is passed through said female fastener aperture and between said resilient legs,

16.        g)     any substantial imbalance along said first axis between said resilient forces of said legs against said stud body will cause said female fastener to move along said first axis in a direction which substantially balances the resilient forces exerted by said legs on said stud body, thereby aligning said female fastener with said stud member, and

17.        h)     whereby said <u>engagement of</u> said legs and said stud body acts to fasten to (sic) said seat insert to said seat shell.

4

C.

Figure 4 illustrates a cross-sectional view of a bottom seat insert in relation to a seat shell.



FIG.4

Figure 6 illustrates the fastener in an enlarged view of the area within the circled portions of Figure 4.



FIG.6

Figure 7 illustrates a cross-sectional view substantially along line 7-7 of Figure 6.



FIG.7

An exploded view of an embodiment of Claim 6 reduced to practice by ASC as envisioned by Freedman follows:



Figure 6 the washer 50 is a free-standing structure.  The principle disagreement between the parties relates to the structure of element 13e, "a retaining member."

## III.  THE RULES

### A.

The rules regarding claim interpretation have previously been described by the Court in its decision in <u>Honeywell International, Inc. v. ITT Industries</u>, 330 F. Supp. 2d 865, 875-77 (2004), and will not be repeated here.  Since the decision in <u>Honeywell</u>, the Court of Appeals for the Federal Circuit issued <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (<u>en banc</u>), in which it reaffirmed many of the principals of claim construction in determining what the claims mean.  A recent publication from the Federal Circuit Bar Association best describes the teaching from <u>Phillips</u>:

> Four principal sources of evidence are available to the trial court in construing claims: the language of the claims; the specification; the prosecution history; and extrinsic evidence.  <u>Phillips</u> clarified the role and relative important of each type of evidence.  In general, the ordinary meaning of the terms used in the claims to one of ordinary skill in the art is determined in the context of the specification.  The prosecution history, if in evidence, is evaluated to determine whether the inventor disclaimed or disavowed any scope that may otherwise be considered within the claims.  Yet, because the prosecution history reflects an ongoing negotiation between the applicant and the Patent Office, rather than the outcome of that negotiation, it often lacks the clarity of the specification and, thus, is less useful than the specification for claim construction purposes.  Finally, extrinsic evidence may be useful but is generally less reliable than the patent and its prosecution history in construing the claims.

<u>Guidelines for Patent Claim Construction Post-Phillips: The Basics of a "Markman" Hearing</u>, Federal Circuit Bar Association Patent Litigation Committee Markman Project (May 2006).  <u>Phillips</u> reaffirmed the importance of internal sources, <u>i.e.</u> the patent, the specification, and the prosecution history over external sources, <u>i.e.</u> dictionaries, treatises, encyclopedias and the like in construing claim terms.

9

B.

In this construction exercise, with the exception of the phrase "retaining member" and "aperture" there is no need to go outside the claim language and specification for assistance in interpreting the ambiguous words and phrases of Claim 6.  As to "retaining member," there is no need to go outside the file history and two pieces of prior art.  In short, the Court need generally to resort to internal sources to construe the ambiguous words and phrases.[2]

C.

The Court as noted above is aware of the accused device and, indeed, Freedman has brought it into play in its argument.  Also as noted above, the Court has not taken it into consideration in the construction exercise.  Perhaps it should have.  In a recent case the Federal Circuit suggested that the court should take a "glimpse of the accused product," Wilson Sporting Goods Corp. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1331 (Fed. Cir. 2006).  See also Lava Trading, Inc. v. Sonic Trading Management, LLC, 445 F.3d 1348, 1350 (Fed. Cir. 2006) to the same effect.

In any event, there will be ample opportunity to reexamine claim construction as the case proceeds further.  To consider the accused product now would only complicate what is a difficult task at best, particularly where there is the display of excessive tendentiousness in the arguments of the parties.

### IV.  CLAIM CONSTRUCTION

*A.  Engaging Surface (2a)*

---

[2]As to "aperature," as will be seen, the dictionary was helpful.

The parties agree that this phrase is to be construed as follows:

> the surface of the seat shell that comes into physical contact
> with the seat insert

### B.  A Female Fastener (5d)

The female fastener is clearly a structure with an opening which is designed to receive a second structure, in this case, the stud.  The two in combination secure the insert with the seat shell.  All of this is described in col. 5, ll 37-41 and col. 5, ll 45-48 as follows:

> While sliding seat rearwardly studs are lowered and inserted
> through central aperture of their respective female fastener

> * * *

> the cooperative arrangement between studs and their
> respective female fasteners acts to securely retain the forward
> portion of seat insert to seat shell

ASC's interpretation of the phrase includes the word "fastener" and is circular.

A straight forward construction of the phrase is as follows:

> A structure, female in form, that receives a stud, male in form,
> which together along with other elements, secures the insert to
> the seat

### C.  A Head Portion (6i)

The head portion describes a feature of the female fastener.  It is referred to in col. 3, ll 19-21 as follows:

> head portion adapted to span the seat shell aperture thereby
> preventing the fastener from passing through the seat shell
> aperture

and col. 7, l 41

> . . .such that head spans aperture.

This phrase is to be construed as follows:

The upper part of the female fastener fashioned in a manner to prevent it from passing through the seat shell.

### D.  Span Said Seat Shell Aperture (7ii)

The parties agree that this phrase is to be construed as follows:

The head portion extends entirely over or across the aperture in the seat shell for preventing the female fastener from falling through the aperture in the seat shell

### E.  Having An Aperture (8iii)

The word "aperture" is used in the '582 patent a number of times:

- col. 2, ll 17-18 ("a female member having a head portion having an <u>aperture</u> therethrough")

- col. 2, ll. 30-31 ("the legs of the female member are inserted into the retaining washer <u>aperture</u>")

- col. 3, ll 18-24 ("a head portion adapted to span the seat shell <u>aperture</u> thereby preventing the fastener from passing through the seat shell <u>aperture</u> into the inner portion of the seat shell, the head portion of the female fastener having an <u>aperture</u> therethrough and two spaced apart, resilient leg portions extending therefrom")

- col. 7, ll 7-9 ("the stud can be inserted through the <u>aperture</u> anywhere along its permissible length")

- col. 7, ll 43-45 ("head is sufficiently long to span <u>aperture</u>, female fastener cannot pass through <u>aperture</u>")

- col. 7, ll 57-58 ("female fastener will remain within shell <u>aperture</u>")

There are additional references to "an aperture" in the Summary of the Invention and in the Detailed Description of the Preferred Embodiment which describe a structure or portions of structure of the fastener system as an "aperture" in like fashion.  Clearly "aperture" is used to describe an opening or hole in a structural element.  This construction is consistent with the dictionary definition.  For example, Funk & Wagnall's Standard College Dictionary (1973) (the one immediately at hand) defines aperture as "an opening,

12

orifice, hole, cleft."

This word is to be construed as follows:

>   an opening or a hole

### F.  Extending Therefrom (9iv)

The phrase "extending therefrom" describes the direction of the two spaced apart and resilient leg portions of the head portion.  The legs are displayed in Fig. 7 as 76 and 78.  They are an integral part of the head portion of the female fastener 46 at one end, and extend downwardly from it through the seat shell aperture 38.  The specification describes them in col. 7, ll 45-47 as follows:

>   Resilient legs 76, 78 pass through aperture 38 and extend into
>   inner portion of seat shell 14.

There is no ambiguity in the phrase.  It simply describes the direction in which the legs point, *i.e.*, downwardly, from the head portion of the female fastener through the seat shell aperture into the inner portion of the seat shell.

The phrase is to be construed as follows:

>   The downward direction of the leg portion of the head portion.

### G.  Adapted to Engage (10v)

The parties agree that this phrase is to be construed as follows:

>   The resilient leg portions are positioned such that they come
>   into physical contact with the stud body to retain it, when the
>   stud is inserted within the head portion aperture

### H.  Engages Said Engaging Surface (11vi)

The parties agree that this phrase is to be construed as follows:

>   The head portion of the female fastener is in physical contact
>   with the engaging surface of the seat shell

13

### I.  A First Axis Parallel to Said
### Engaging Surface of Said Seat Shell (12vii)

The "first axis" are the directions which the female fastener including its leg portion can move.  The directions are shown on Fig. 7 and Fig. 8 as 92 and described in col. 6, ll 59-64 as follows:

> Now referring to FIGS. 7 and 8, female fastener 46 is movable along a first axis 92 by virtue of the fact that the distance 94 between resilient legs 76, 78 is less than opening 96 of aperture 38 along first axis 92.  This dimensional difference between aperture 38 and resilient leg spacing 94 gives rise to tolerance gaps 98, 100.

The movement is designed to accommodate any possible misalignment of the bottom insert and the shell.  Each has an opening and the openings must line up.  See col. 6, ll 64-68:

> Gap 98, 100 define the permissible range in which female fastener 46 may float along axis 92 in order to accommodate any misalignment between insert 20 and aperture 38 of shell 14.

While the phrase really needs no interpretation it can be rephrased as follows:

> The axis which is perpendicular to the legs which extend from the head portion.

### J.  A Retaining Member (13e)

#### 1.  Overview

This phrase is the key element of claim 6 which divides the parties.  Freedman Seating devotes eleven pages in its revised brief to its construction, while ASC in its response devotes nine pages in its brief.

The retaining member has as its function to keep the female fastener in place and to allow it, including its legs, to self-align in attaching the seat insert to the seat shell.  What divides the parties is whether Claim 6 calls for a one piece structure overall or for a two

14

piece structure as displayed in Freedman's drawing of an embodiment of Claim 6 reduced to practice.  See p. 8 supra.

Essentially Freedman argues the retaining member must be two pieces while ASC says that the retaining member need not be a separate structure, and can be part of the overall structure of the female fastener.  As explained below, Freedman has the better of the argument when the teachings of the specification are examined together with the claim language and in light of the file history.

2.  Evidence from the Patent

a.

The specification requires access to both sides of the seat shell in order to engage the legs of the female fastener, col. 9, ll 19-30:

> Also, although reference has been made throughout the text to the "insert" being fastened to the "seat shell," it is to be understood that the fastener of the present invention is not limited to use in any one particular application, but rather is truly a general purpose type fastener and, accordingly can be used, for example, for fastening a decorative panel to a wall divider frame (as shown in FIG. 11), a seat cushion to seat a frame (as shown in FIG. 12) or in any other application where a first member must be fastened to a second member, wherein the second member is accessible from both sides.

The specification requires the fastener to accommodate varying thicknesses of a seat shell, col. 1, ll 48-52:

> It is also desirable, in some applications, to have a fastener which possesses a plurality of locking positions.  Such a fastener may be used in applications where the thickness of material located between the two fastener halves is uncertain or subject to wide variation.

The specification calls for separate fastening components to avoid the need to

remove the entire fastener and discard it before a new one is installed, col. 1, ll 53-61:

> [I]t is often desirable to have a fastener with replaceable parts, especially those parts which tend to wear quickly.  In such a case, if the wear prone parts are field replaceable, they can be serviced in the field.  In cases where the fastener is not constructed with serviceable parts, the entire fastener, or perhaps the fastener and associated members, must be removed and discarded and new ones installed.

In other words, the fastener must have field replaceable components, col. 2, ll 1-3:

> It is yet an additional object of this invention to provide a fastener which has field replaceable components, especially those components which are prone to wear.

The specification states that the retaining member gives the female fastener realignment capability, col. 3, ll 42-54:

> the retaining member allowing the female fastener to move along the first axis, whereby when the seat insert is placed adjacent the seat shell and the stud fastener is passed through the female fastener aperture and between the resilient legs, and whereby any substantial imbalance along the first axis between the resilient forces of the legs against the stud body will cause the female fastener to move along the first axis in the direction which substantially balances the resilient forces exerted by the legs on the stud body, thereby aligning the female fastener with the male fastener, and whereby the engagement of the legs and the stud body acts to fasten the seat insert to the seat shell.

Claim 6 also states this, col. 11, ll 30-31:

> said retaining member allowing said female fastener to move along said first axis.

Only a retaining structure separate from the structure of the female fastener including its legs can meet all of the above requirements.

b.

16

Additionally, the functioning of the retaining member calls for a separate structure. The retaining member when it engages (or comes into contact) with the legs keeps the female fastener in place, col. 2, ll 39-45, by preventing it from being pulled out:

> the retaining washer engaging end of each leg passes completely through the retaining washer aperture thereby being released from their compressed position and causing the retaining washer engaging end of each leg to engage the second side of the retaining washer thereby retaining the female fastener in the aperture of the second member...

while at the same time allowing for some movement, col. 3, ll 34-42:

> such that the female fastener is permitted to move within the seat shell aperture along a first axis parallel to the engaging surface of the seat shell, a retaining member adapted to reside in the inner portion of the seat shell and engage the legs of the female fastener thereby preventing the female fastener from being pulled out of the seat shell aperture...

and col. 7, ll 47-59:

> While retaining female portion 46 in this position, aperture 51 of retaining clip 50 is placed around resilient legs 76, 78 and pushed thereon.  This pushing force compresses legs 76, 78 towards one another until aperture 51 of retaining clips 50 passes over spurs 54 wherein the legs 76, 78 resiliently spring outwardly assuming their normal position and spurs 84 engage outer surface 90 of retaining clip 50 thereby preventing female fastener 46 from pulling out 88 of shell apertures 38.  While washer 50 is retained by spurs 84, it can be seen that female fastener 46 will remain within shell aperture 38.  The final step is to insert studs 26 over apertures 102 of their respective female fasteners 46.

c.

There are additional reasons from a reading of the specifications for construing a retaining member to call for a structure separate from the female fastener including the legs.  This is made clear by the manner in which the '583 patent uses the phrases <u>retaining</u>

member, retaining washer and retaining clip interchangeably.

The Abstract describes "a clip on the opposite side of the panel for retaining the female fastener in the aperture."

The Summary of the Invention describes "a stud engaging end and a retaining washer engaging end, col. 2, ll 21-22 and "a retaining washer having first and second sides, col. 2, ll 25-26 and retaining washer, col. 2, ll 23-36.

The Summary of the Invention describes the invention "provid[ing] a self-insert fastening system," col. 3, l 7-8.  The phrase retaining member is described as the structure which allows movement of the female fastener in the aperture as well as prevents the female fastener from being pulled out of the shell aperture, see col. 3, ll 38-41.  This is clearly the same structure as the referenced washer earlier described.

In the Detailed Description of the Preferred Embodiment, we find the phrases "retaining clips (or washers) 48, 50," col. 5, ll 11-12; "washer 50 (or retainer)," col. 6, l 29; "retaining clip 50," col. 7, ll 48, 51, 54; "washer (or retainer) which has previously been described," col. 8, ll 39-40, used interchangeably.

Clearly, this variable use calls for the washer as a separate structure; and therefore the retainer, which is a synonymous structure, must also be a separate structure.

d.

Lastly, it is clear from a reading of Claim 6 and in light of Claim 1 that a two piece structure is called:

Claim 1 which describes the invention of the '582 patent as a

> self-aligning fastener system for attaching a first member to a
> second member

18

calls for a "retaining washer" throughout.

Claim 6 which describes the invention in a more limited way

> a seat insert fastening system, for fastening an insert to a
> seating portion of a seat shell

calls for a "retaining member."

The two structures have identical functions. Claim 6 is more narrowly directed than Claim 1. The structure of the retaining member of Claim 6 is no broader or different than the retaining member of Claim 1.

Arguing claim differential is of no moment. Two claims with different terminologies can (and here do) define the same subject matter. Hormone Research Foundation v. Genetech, Inc., 904 F.2d 1558, 1567, n.15 (Fed. Cir. 1990).

### 2. Evidence from the File History

Up to now in construing the phrase retaining element, the Court has considered only the language from the patent, with particular emphasis on the specification. Consideration of the file history of the '582 patent is in order because it was the applicant's response to the examiner's rejection which conclusively establishes a finding that the applicant expressly disclaimed coverage of the retaining member being an integral part of the female fastener.

In the Office Action of January 7, 1992, Claim 6 in its present form was rejected with the examiner stating in part:

> It would have been obvious at the time the invention was made
> to a person having ordinary skill in the art to have substituted
> a resilient retaining washer for the work piece b of Tinnerman
> '148 as taught by Carr to allow some flexing between the
> attached members a and c.

The applicant responded in part as follows:

> . . .The Examiner further states that it would have been obvious at the time the invention was made to a person having ordinary skill in the art to have substituted a resilient retaining washer for the work piece b of Tinnerman '148 as taught by Carr to allow some flexing between the attachment members a and c.
>
> Two purposes are served by use of washer 9 in the Carr reference.  First, it is used to hold nut member 3 in assembly with Metzel part 1 (page 1, lines 23-66) and secondly it is used to grip the walls surrounding the aperture 2 within supporting part 1 (lines 79-83).  However, both of the above-referenced functions of washer 9 are served by retaining elements 16 in Tinnerman.  Retaining elements 16 function to maintain work pieces a, b in proper assembled relation while also locking the clip in its position prior to attachment (see page 2, lines 7-17). Thus, there would be no motivation to add the washer of Carr '367 to the fastener of Tinnerman '148 in that it merely duplicates a function which is already present in the fastener. In the present invention, washer 90 serves the purpose of allowing female fastener portion 46 to float within aperture 38 thereby giving the fastener of the present invention its self aligning attributes.  Accordingly, there is no motivation to combine the washer as taught by Carr with the fastener as taught by Tinnerman.  Carr does not teach the use of a washer in a way which allows the fastener to float within an aperture. There is no motivation to combine the washer of Carr to the fastener of Tinnerman to produce a self-aligning fastener inasmuch as neither Carr nor Tinnerman teaches the advantages of a self-aligning fastener.

Tinnerman, U.S. Patent No. 2,303,148, describes a nut fastened installation.  It calls for a unitary restraining structure integral with a female fastener.  All of this is described in col. 2, ll 34-57 which need not be recited here because all this is shown in Fig. 1 and particularly Fig. 4 of Tinnerman.

Carr, U.S. Patent No. 1,646,367, covers a nut and screw fastener and shows a dish-shaped washer 9 which is "snapped over the head of the nut to hold it in the assembly," col. 2, ll 56-58.

To combine Tinnerman with Carr as suggested by the examiner would result in non-integrated two pieces functioning to retain the fastener and integrated legs in place.

The applicant argued against the two pieces retainer resulting from a combination of Tinnerman and Carr because these were all really the two pieces called for by Claim 6. This is what was meant by the statement in the response:

> Thus, there would be no motivation to add the washer of Carr '367 to the fastener of Tinnerman '148 in that it merely duplicates a function which is already present in the fastener.

ASC cannot reclaim subject matter which was disclaimed.  See Rhodia Chimie v. PPG Ind., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005).  As stated in Freedman Seating's Revised Responsive Claim Construction Brief at p. 25:

> Clearly, ASC argued during prosecution that the structure taught by the prior art Tinnerman patent – namely, a one-piece female fastener having an integral structure which first "locks" the fastener into position within an aperture from one, not two sides of access, by "gripping" the walls surrounding the aperture, and which secondly carried its own, integrated, stud-receiver (a threaded nut) – was patentably distinct fro the two-piece structure claimed by ASC, including claim 6, which requires a separate "retaining washer" to maintain the fastener in position within the aperture.  Simply put, ASC argued that its invention did not encompass a female fastener that was maintained within an aperture without the use of a separate "retaining member."

3. Construction

The phrase "retaining member" is construed as follows:

> A structural element separate and distinct from the female
> fastener adapted to come into physical contact with the legs of
> the female fastener to restrain the position of the head portion
> on the outer portion of the seat shell

### K. Engage (13i)

In the context of Claim 6, engage means come in contact with or attach to, to the extent there is any ambiguity in the word.

The phrase is to be construed as follows:

> come in contact with or attach to

### L. Said Retaining Member Allowing
### Said Female Fastener to Move Along Said First Axis (14ii)

It is not clear why Freedman identified this phrase as ambiguous and why ASC did not say the phrase needs no construction and that its meaning is self-evident.  This phrase states the purpose of the retaining member, previously described, and its function, previously described, and the manner in which the functions perform.  Obviously the female fastener must be held in place to assure fastening and because of possible misalignment some play is possible and that play is kept to a perpendicular movement, previously described.  There is no need to construe this phrase.

### M. Engagement Of (17h)

While Exhibit A states a slight difference between ASC's construction of the phrase "engagement of" and Freedman's construction, ASC in its Reply to Freedman Seating's Revised Responsive Claim Construction Brief says it agrees with Freedman's construction. Therefore the phrase is to be construed as follows:

The resilient legs of the head portion comes into physical contact with the position of the stud body

## V. CONCLUSION

The 13 words and phrases identified by Freedman have been construed as above. These constructions will govern the further course of the case. Should either a motion for summary judgment or the evidence at trial call for reconsideration, after the structure of the fastening system of the Angel Seat assembly is fully explored, a different construction might obtain.

It has taken some time for this decision to be completed, largely because of the number of words and phrases identified as ambiguous, and because the order of argument in the parties' briefs were not coordinated.

The deputy clerk will schedule a conference to discuss the future course of the case.

SO ORDERED.


 s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  July 27, 2006


I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, July 27, 2006, by electronic and/or ordinary mail.


 s/Julie Owens
Case Manager, (313) 234-5160